**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re *Ex Parte* Application of Libyan Asset Recovery and Management Office to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782,<br><br>Petitioner. | Misc. Case No. M-_____ |

**MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201

**Holland & Knight**
31 West 52nd Street
New York, NY 10019
Telephone: 212.513.3200
Facsimile: 212.385.9010

**TABLE OF CONTENTS**

**Page**

BACKGROUND ...................................................................................................................1

ARGUMENT .......................................................................................................................6

    I.    PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782.................................................................................................7

    II.    THE COURT SHOULD GRANT THE PROPOSED DISCOVERY ORDER ......8

    III.    THE COURT SHOULD GRANT PETITIONER'S APPLICATION *EX PARTE*..................................................................................................10

CONCLUSION ...................................................................................................................11

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
    785 F. Supp. 2d 434 (S.D.N.Y. 2011).......................................................................................10

*Intel Corp.* v. *Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ...........................................7, 8

*In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*,
    No. Civ. M19-88 (BSJ), 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006)....................................9

*In re Application of Gorsoan Ltd. and Gazprombank OJSC for an Order Pursuant*
    *to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*,
    No. 13 Misc. 397(PGG), 2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014).................................10

*In re Application of Hornbeam Corp.*,
    No. 14 Misc. 424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) .......................................9, 10

*Brandi-Dohrn v. 1KB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012)....................................................................................................7, 8

*In re Chevron Corp.*,
    No. 10-mc-00002 (LAK) (S.D.N.Y. Aug. 6, 2010).................................................................10

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995)......................................................................................................9

*Lancaster Factoring Co. Ltd. v. Mangone*,
    90 F.3d 38 (2d Cir. 1996)..........................................................................................................7

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
    376 F.3d 79 (2d Cir. 2004)........................................................................................................8

**Statutes**

28 U.S.C. § 1782................................................................................................................ *passim*

Petitioner, the Libyan Asset Recovery and Management Office ("LARMO" or "Petitioner"), respectfully submits this memorandum of law, together with the accompanying Declaration of Anwar Arif dated December 7, 2021 ("Arif Decl."), in support of its Application for an order pursuant to 28 U.S.C. § 1782 authorizing Petitioner to conduct discovery for use in aid of a foreign proceeding by serving a subpoena on each of Bank of America N.A., Citibank d/b/a Citigroup Inc., JP Morgan Chase Bank N.A., UBS Group N.A., HSBC Bank, Credit Suisse Bank N.A., Bank of New York Mellon Corporation, and Deutsche Bank Trust Company Americas (together, the "US Banks").

## BACKGROUND

1. Gaddafi's Dictatorship Looted Libyan State Assets

From 1969 until 2011, Libya was ruled by Muammar Muhammad Abu Minyar al-Gaddafi. From 1969 to 1977, Gaddafi governed as the "Revolutionary Chairman" of the Libyan Arab Republic, and from 1977 to 2011, Gaddafi styled himself the "Brotherly Leader" of the Great Socialist People's Libyan Arab Jamahiriya. (Arif Decl. ¶ 4.)

Gaddafi's complete control of the Libyan State apparatus allowed him to place family members and loyalists in key positions. (*Id.* ¶¶ 6-7 & Ex. 2.) This ensured that Gaddafi would be enriched by all significant business activity taking place in Libya. (*Id.*)

As a February 2009 cable from the U.S. Embassy in Libya reported:

> Muammar al-Qadhafi [sic] remains intimately involved in the regime's most sensitive and critical portfolios. He has used an influential but obscure administrative entity to politically vet commercial contracts involving [Government of Libya] funds and ensure that opportunities to extract rents from those contracts are distributed to key regime allies.
> \* \* \*
> Libya remains a kleptocracy in which the regime has a direct stake in anything worth buying, selling[,] or owning. [Gaddafi]'s mastery of tactical maneuvering has kept him in power for nearly 40 years; however, the unholy alliance of corruption and cult-of-

1

> personality politics on which the system has been based is ultimately limiting.
>
> * * *
>
> Libya is a kleptocracy in which the regime - either the [Gaddafi] family itself or its close political allies - has a direct stake in anything worth buying, selling[,] or owning. .

(*Id.* Ex. 2)

The reports concerning Gaddafi and his family were consistent. As a 2011 *Reuters* article summarizing prior coverage of Col. Gaddafi's dictatorship explained:

> [T]he lion's share of business enterprise has been dominated by Gaddafi and his family. "It's totally corrupt," one Libyan corporate investigator told one New York Times reporter. "This is just how business works in Libya." (*Id*. Ex. 3.)

Gaddafi's corruption made him and his family enormously wealthy at the expense of the Libyan people. A March 9, 2011 *New York Times* article estimated that Gaddafi had "'tens of billions' in cash secretly hidden away in Tripoli…" (*Id*. Ex. 4.) Gaddafi's corruption funded a lavish lifestyle. He reportedly invested at least $100 million in films, and routinely paid celebrities to attend his parties, including Mariah Carey, Beyonce, Usher, and Lionel Richie. (*Id*. ¶ 10 & Exs. 5, 6 & 7).

Transparency International, a non-governmental organization which studies and publishes rankings of perceived corruption, consistently ranked Libya among the most corrupt nations in the world during the Gaddafi regime. (*Id*. ¶ 11.) In 2003, Transparency International ranked Libya as the 15th most corrupt economy of 133 surveyed. (*Id*. ¶ 11.) In 2011, Libya ranked as 14th most corrupt out of 182 countries surveyed. (*Id*. ¶ 11 & Exs. 8 & 9.)

In early 2011, as the Arab Spring swept across the Middle East, protest movements took root throughout Libya. By February 2011, the forces of Libya's National Transitional Council were in revolt against the Gaddafi regime. (*Id*. ¶ 12.)

On February 26, 2011, the United Nations Security Council passed Resolution 1970. A signal of the international community's support for change in Libya, Resolution 1970 referred various Gaddafi regime figures and entities to the International Criminal Court while freezing assets belonging to Gaddafi, his friends and family. (*Id.* ¶ 13 & Ex. 10.).

At that time, it was estimated that Gaddafi and his family had stolen and were holding more than $200 billion from the Libyan people. (*Id.* ¶ 15 & Ex. 11.) By 2018, however, the European Union estimated that that "[t]he country's public coffers had been extensively looted during the Gaddafi regime, and well over **USD 40 billion** in assets remain outside of Libya." (*Id.* ¶ 15 & Ex. 12.) While the total amount stolen by Gaddafi, his family, and his agents is currently unknown and some reports place the number as high as $200 billion, LARMO currently estimates that at least tens of billions of dollars' worth of assets belonging to the Libyan people were stolen by Gaddafi and his agents and remain missing. (*Id.* ¶ 15.)

    2.  <u>Prior Efforts to Repatriate Stolen Assets</u>

After Gaddafi's downfall, Libya faced many challenges that impaired the Libyan government's ability to recover the assets stolen by Gaddafi from the Libyan people. Among other things, between 2014 and 2020, Libya experienced a multi-sided civil war in which competing regional factions struggled for control, often with the support of rival foreign powers and mercenaries. (*Id.* ¶ 16.) During this difficult period, several entities purported to seek to recover and repatriate assets misappropriated by Gaddafi and his family. These efforts were generally unsuccessful as a consequence of Libya's political instability and the lack of a clear administrative structure for managing the asset recovery process. (*Id.* ¶ 17.)

Libya's civil war ended in December 2015 with the establishment of a Government of National Accord with United Nations support. (*Id*. ¶ 18). In March of 2021, the Government of National Accord was reconstituted as a Government of National Unity, headed by a Presidential Council (whose Chairman acts as Head of State) and a Prime Minister. (*Id*. ¶ 18).

Given the scale of Gaddafi's theft from the Libyan people, recovery of stolen assets is an essential priority for Libya. (*Id*. ¶ 19). According to a June 2021 report from the United Nations Interregional Crime and Justice Research Institute ("UNICRI"), "recovery of only 10% of the Assets lost through illicit financial flows . . . would . . . cover nearly 400% of the funding requirement of the United Nations Humanitarian Response Plan's Budgetary request for the Libyan Health Sector." (*Id*. ¶ 19).

### 3. LARMO Established to Recover Stolen State Assets

Thus, working with advisers from the European Union and the United Nations, Libya established LARMO as a single agency responsible for locating, recovering, and repatriating stolen as well as neglected or abandoned State assets for the Libyan people, pursuant to Resolution No. 1011/2017 of the Presidential Council of Libya's Government of National Accord dated October 24, 2017. (*Id*. ¶¶ 20-21 & Ex. 1). On December 19, 2019, by resolution No. 1496/2019, the Presidential Council of Libya's Government of National Accord issued the current LARMO Statute. (*Id*. ¶ 23 & Ex. 13).

Under Article 6 of the Statute, LARMO has exclusive authority to, investigate, trace, recover, and manage stolen, neglected or abandoned assets of the Libyan State.[1] (*Id*. ¶¶ 24-26.)

---

[1] LARMO does not currently seek to recover assets that belong to other Libyan State entities. For example, the Central Bank of Libya ("CBL") and the Libya Investment Authority ("LIA") both have assets in different jurisdictions, many of which were frozen in response to the Gaddafi regime's crimes. (Arif. Decl. ¶¶ 32-32). Those assets have not, however, been stolen, neglected or abandoned from the Libyan State. Their recovery is thus beyond the scope of LARMO's mandate and LARMO does not seek to recover them in connection with its actions here. (*Id*. ¶ 31.) Nonetheless, because Gaddafi and his family also used LIA and the CBL accounts for personal

4

Article 7 of the Statute provides that LARMO shall undertake a search and investigation of "looted and smuggled Libyan Funds and Assets" and shall be responsible for collecting "all the related and evidencing documents." (*Id.* ¶¶ 25)

Assets recovered by LARMO belong to the Libyan State. (*Id.* ¶ 26.) To ensure the transparent distribution of recovered assets, the Statue gives LARMO title to all stolen, neglected or abandoned State assets recovered from abroad until 30 days after their recovery. (*Id.* ¶ 26.) Thereafter, though LARMO does not own the assets, LARMO continues to administer those assets in a fund, until those assets are ultimately distributed to local and municipal governments that meet transparency and anti-corruption requirements. (*Id.* ¶ 26.)

4. <u>Scope of and Need for Proposed Discovery</u>

Unfortunately, most of the records that would have detailed the theft of Libyan State funds by Gaddafi and his family have been destroyed or lost since the collapse of his regime. Despite the vast scale of the theft, LARMO has very few records indicating where Gaddafi, his family, and associates hid and continue to hide what they stole. Based on its preliminary investigation, however, LARMO believes that Gaddafi and his family stashed hundreds of millions of dollars' worth of stolen Libyan State funds in European, African, and offshore jurisdictions. (*Id.* ¶ 27.)

Foreign banks typically use U.S.-based banks to clear dollar-denominated transactions using the Clearing House Interbank Payments System ("CHIPS"). The CHIPS system is used for virtually all dollar-denominated transactions and for transactions where the dollar is used as an intermediate currency to facilitate a currency exchange. The U.S.-based correspondent banks

---

transactions, some of the discovery LARMO seeks here may concern transactions made in the name of the CBL and the LIA but which actually served to misappropriate assets for the benefit of Gaddafi and his family. (*Id.* ¶ 32.)

5

that execute clearing transactions keep detailed records showing the source and destination for all such transactions. (*Id.* ¶ 33).

LARMO believes that the correspondent bank records of relevant dollar-denominated transactions will provide invaluable evidence that will allow LARMO to identify and trace assets to be recovered under its mandate and will also assist LARMO with its effort to identify the persons improperly holding such assets in various foreign jurisdictions in which LARMO's assets are believed to be located. (*Id.* ¶ 34.)

Based on its investigation to date, LARMO has reason to believe that assets misappropriated by Gaddafi, his family, and/or his agents, were transferred through the US Banks. (*Id.* ¶ 35.) LARMO seeks, pursuant to the subpoenas attached to the Application as Exhibits A-H, to obtain records from the US Banks relating to dollar-denominated transactions undertaken by or on behalf of Gaddafi. (*Id.* ¶ 36.) LARMO will use that information to commence lawsuits in the relevant jurisdictions to freeze and recover the identified assets. (*Id.* ¶ 37.) LARMO will act to the fullest extent of its authority to recover and restore this wealth to the Libyan people. (*Id.* ¶ 38.)

## ARGUMENT

Section 1782 of Title 28 of the United States Code permits the United States District Courts to grant discovery for use in a foreign proceeding. The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person . . . .

28 U.S.C. § 1782. The goals of this statute are twofold: "to provide equitable and efficacious discovery procedures in the United States courts for the benefit of tribunals and litigants involved in litigation with international aspects . . . and to encourage foreign countries to provide similar

means of assistance to [United States] courts." *Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 41 (2d Cir. 1996) (internal quotations and citations omitted). "In pursuit of these twin goals, the section has, over the years, been given increasingly broad applicability." *Id.* (internal quotations and citations omitted).

When a court finds that the statutory requirements of 28 U.S.C. § 1782 are met, it may, in its discretion, grant an application for discovery. The United States Supreme Court has articulated a number of factors the district courts should consider when weighing an application under Section 1782. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). As set forth in greater detail below, all of these discretionary factors weigh in favor of granting Petitioner the requested discovery.

I. **PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782**

Courts are authorized to grant an application made pursuant to 28 U.S.C. § 1782 where "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. 1KB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012). Petitioner's Application satisfies all three statutory requirements.

**First**, each of the US Banks resides or is found in this District. (Arif Decl. ¶ 35.) Petitioner seeks records that should be held in each of the US Banks' ordinary course of business and which each of the US Banks should be able to easily produce in this District.

**Second**, the discovery sought is for use in contemplated foreign proceedings to recover such assets.

**Third**, Petitioner is an "interested person" authorized to bring this application. As noted above, under Article 6 of the Resolution, LARMO is invested with the exclusive authority to, investigate, trace, recover, and manage assets that are owned or supposed to be owned by the Libyan State. *See* Arif Decl. ¶ 24; *Intel Corp.*, 542 U.S. at 256.

## II. THE COURT SHOULD GRANT THE PROPOSED DISCOVERY ORDER

"Once the statutory requirements [of 28 U.S.C. § 1782] are met, a district court is free to grant discovery in its discretion." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004) (internal quotations and citation omitted). The Supreme Court has identified a number of factors that the district courts are to consider in ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent foreign proof gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel Corp.*, 542 U.S. at 264-65; *Brandi-Dohrn*, 673 F.3d at 80-81. Here, all of these factors weigh in favor of granting Petitioner's application.

First, where, as here, discovery is sought from entities that are not participating in the foreign proceeding, the need for court-ordered discovery is apparent. As the Supreme Court explained, "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. By contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel Corp.*, 542 U.S. at 264 (internal citations omitted). Here, LARMO has no intention of suing the correspondent banks that hold

8

records that may reveal the destination of funds belonging to the Libyan people. The only means for LARMO to access these records is through this Application.

The second factor identified by the Supreme Court—the nature of the foreign proceedings and the receptivity of the foreign tribunal to federal-court assistance—requires courts to consider "(1) whether United States assistance would offend the foreign country, and (2) whether the material sought is admissible in the foreign tribunal." *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL 3844464, at *6 (S.D.N.Y. Dec. 29, 2006) (internal citations omitted). In weighing these elements, courts may only rely on "authoritative proof." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995). Here, the assistance of the U.S. Courts would not offend the tribunals of Libya or any foreign state, but rather would assist LARMO, an agent of the Libyan state and therefore the Libyan people, to remedy a long simmering injustice.

LARMO's bona fides are established by the oversight stemming from the United Nations and the European Union. Indeed, LARMO will not achieve any financial gains from its recoveries. Following from this, the third factor also suggests that discovery should be granted, as this application is clearly not an attempt to circumvent any foreign proof gathering restrictions. "[T]he burden is on the opponent of a § 1782 request to prove that the foreign court would reject the evidence obtained through § 1782." *In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014); *see also Euromepa*, 51 F.3d at 1099-1100 ("[W]e believe that a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782."). The discovery sought here is specifically aimed at identifying assets that have been stolen from the Libyan people and dissipated by Gaddafi and

9

his agents and will form the basis of lawsuits and recovery efforts around the world. This discovery will not circumvent foreign proceedings anywhere, but rather, will be used in support of those proceedings to return stolen property to its rightful owners—the Libyan people.

Finally, this application is not burdensome. Bank records are routinely sought and produced via § 1782 petitions. *See, e.g.*, *Hornbeam Corp.*, 2014 WL 8775453, at *5 (ordering production of bank records, including wire transfers, pursuant to § 1782); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 437-39 (S.D.N.Y. 2011) (granting § 1782 petition seeking disclosure of account statements, account opening materials, customer files, and due diligence materials).

### III. THE COURT SHOULD GRANT PETITIONER'S APPLICATION *EX PARTE*

The Court should grant Petitioner's Application *ex parte*. *Ex parte* applications under 28 U.S.C. § 1782 are routine in this district. *See In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, 15-mc-417 (LAK), 2016 WL 702327, at *5 (S.D.N.Y. Feb. 18, 2016); *In re Application of Gorsoan Ltd. and Gazprombank OJSC for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 13 Misc. 397(PGG), 2014 WL 7232262, at *5 (S.D.N.Y. Dec. 10, 2014). As noted by Judge Kaplan:

> Applications pursuant to 28 U.S.C. § 1782 are frequently granted *ex parte*. Where, as here, the application is for the issuance of subpoenas, no substantial rights of the subpoenaed person are implicated by such action, as the subpoenaed person, once served, is entitled to move to quash or modify the subpoenas.

*In re Chevron Corp.*, No. 10-mc-00002 (LAK) (S.D.N.Y. Aug. 6, 2010) (Dkt. 2). The US Banks will not be prejudiced by granting Petitioner's application *ex parte* as they will have an opportunity to challenge the discovery Petitioner seeks once it is served.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court endorse the Proposed Order annexed to the *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings ("Application") and to serve the subpoenas annexed to the Application as Exhibits A-H.

Dated: December 9, 2021
　　　　New York, New York

**BAKER & HOSTETLER LLP**
*/s/ Oren Warshavsky*
Oren Warshavsky
owarshavsky@bakerlaw.com
Gonzalo S. Zeballos
gzeballos@bakerlaw.com
Tatiana Markel
tmarkel@bakerlaw.com
Michelle R. Usitalo
musitalo@bakerlaw.com
Carlos Ramos-Mrosovsky
cramosmrosovsky@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201

-and-

**Holland & Knight**
*/s/ Warren Gluck*
Warren E. Gluck
Warren.Gluck@hklaw.com
Ruarri Rogan
Ruarri.Rogan@hklaw.com
Robert J. Burns
Robert.Burns@hklaw.com
Richard A. Bixter, Jr.
Richard.Bixter@hklaw.com
31 West 52nd Street
New York, NY 10019
Telephone: 212.513.3200
Facsimile: 212.385.9010

*Attorneys for Petitioner*