UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re *Ex Parte* Application of Libyan Asset Recovery and Management Office to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782,<br><br>Petitioner. | Misc. Case No. M-_____ |

# DECLARATION OF ANWAR ARIF IN SUPPORT OF PETITIONER'S EX PARTE APPLICATION FOR AN ORDER AUTHORIZING DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

I, Anwar Arif, declare, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746(1), that the following is true and correct:

1. I am the President of the Libyan Asset Recovery and Management Office ("LARMO"), the Libyan government agency charged with the international recovery of looted, abandoned, or neglected State assets. I was appointed to this position by decree of the Presidential Council of Libya's Government of National Accord on October 24, 2017. A copy of this decree and an accurate translation are attached as <u>Exhibit 1</u>.

2. Unless otherwise specified, I make this Declaration based on my own personal knowledge and in support of LARMO's application for an order authorizing it to conduct discovery in aid of foreign proceedings under 28 U.S.C. § 1782.

3. If called as a witness, I could and would testify to the same as stated herein.

**Gaddafi's Dictatorship Looted Libyan State Assets**

4. From 1969 until 2011, Libya was ruled by the dictatorship of Colonel Muammar Muhammad Abu Minyar al-Gaddafi ("Gaddafi"). From 1969 to 1977, Gaddafi ruled as the

1

"Revolutionary Chairman" of the Libyan Arab Republic, and from 1977 to 2011, Gaddafi styled himself the "Brotherly Leader" of the Great Socialist People's Libyan Arab Jamahiriya.

5. Gaddafi enriched himself and his family through corruption.

6. Gaddafi's complete control of the Libyan State apparatus allowed him to place family members and loyalists in key positions, ensuring that he and his family would be enriched by any significant business activity taking place in Libya.

7. A February 2009 cable from the U.S. Embassy in Libya reported:

> Muammar al-Qadhafi [sic] remains intimately involved in the regime's most sensitive and critical portfolios. He has used an influential but obscure administrative entity to politically vet commercial contracts involving [Government of Libya] funds and ensure that opportunities to extract rents from those contracts are distributed to key regime allies.
>
> * * *
>
> Libya remains a kleptocracy in which the regime has a direct stake in anything worth buying, selling[,] or owning. [Gaddafi]'s mastery of tactical maneuvering has kept him in power for nearly 40 years; however, the unholy alliance of corruption and cult-of-personality politics on which the system has been based is ultimately limiting.
>
> * * *
>
> Libya is a kleptocracy in which the regime - either the [Gaddafi] family itself or its close political allies - has a direct stake in anything worth buying, selling[,] or owning.

A copy of that cable, as reproduced by WikiLeaks, is attached as Exhibit 2.

8. The reports concerning Gaddafi and his family were consistent. As a 2011 Reuters article summarizing prior coverage of Col. Gaddafi's dictatorship explained:

> [T]he lion's share of business enterprise has been dominated by Gaddafi and his family. "It's totally corrupt," one Libyan corporate investigator told one New York Times reporter. "This is just how business works in Libya."

A copy of that article is attached as Exhibit 3.

9. Gaddafi's corruption made him and his family enormously wealthy at the expense of the Libyan people. For example, a March 9, 2011 *New York Times* article estimated that Gaddafi and his family had "'tens of billions' in cash secretly hidden away in Tripoli . . . ." A copy of that article is attached as Exhibit 4.

10. Gaddafi's corruption funded a lavish lifestyle. He reportedly invested at least $100 million in films, and routinely paid some of the United States' biggest celebrities to attend his parties. In fact, Wikileaks documents show that the Gaddafi family was having extravagant parties attended by the likes of Mariah Carey, Beyonce, Usher, and Lionel Richie. The Wikileaks cable and Rolling Stone article (https://www.rollingstone.com/music/music-news/beyonce-mariah-carey-and-usher-performed-at-qaddafi-family-parties-246814/) discussing the same are attached hereto as Exhibit 5 and Exhibit 6. A CNBC article from 2013 describing Gaddafi's extravagant spending is attached as Exhibit 7.

11. Transparency International, a non-governmental organization which studies and publishes rankings of perceived corruption, consistently ranked Libya among the most corrupt nations in the world during the Gaddafi regime. In 2003, Transparency International ranked Libya as the 15th most corrupt economy of 133 surveyed. In 2011, Libya ranked as 14th most corrupt out of 182 countries surveyed. Copies of the Transparency International country reports for Libya from 2003 and 2011 are attached as Exhibit 8 and Exhibit 9.

12. In early 2011, as the Arab Spring swept across the Middle East, protest movements took root throughout Libya. By February 2011, the forces of Libya's National Transitional Council were in revolt against the Gaddafi regime.

13. Soon thereafter, on February 26, 2011, the United Nations Security Council passed Resolution 1970. Signaling the international community's support for change in Libya,

Resolution 1970 referred various Gaddafi regime figures and entities to the International Criminal Court while freezing assets belonging to Gaddafi, his friends and family. A copy of U.N. Security Council Resolution 1970 is attached as <u>Exhibit 10</u>.

14. The Libyan Revolution ended after Gaddafi's death in October 2011. Gaddafi's sons Mutassim Gaddafi, Saif al-Arab Gaddafi, and Khamis Gaddafi, are all believed to have died during the Libyan Revolution.

15. At that time, it was estimated that Gaddafi and his family had stolen more than $200 billion from the Libyan people. A copy of an article from the *Los Angeles Times* estimating that Gaddafi and his family held $200 billion worth of corrupt assets and investments is attached as <u>Exhibit 11</u>. A 2018 European Union Implementing Decision, a copy of which is attached as <u>Exhibit 12</u>, estimated that that "[t]he country's public coffers had been extensively looted during the Gaddafi regime, and well over **USD 40 billion** in assets remain outside of Libya." (emphasis added). While the total amount stolen by Gaddafi, his family, and his agents is currently unknown and some reports place the number as high as $200 billion, LARMO currently estimates that at least tens of billions of dollars' worth of assets belonging to the Libyan people were stolen by Gaddafi and his agents and remain missing.

<b><u>Prior Efforts to Repatriate Expropriated Assets</u></b>

16. After Gaddafi's downfall, Libya's new government faced many challenges that impaired its ability to recover the assets stolen by Gaddafi from the Libyan people. Among other things, between 2014 and 2020, Libya experienced a multi-sided civil war in which competing regional factions struggled for control, often with the support of rival foreign powers and mercenaries.

17. During this difficult period, several entities purported to seek to recover and repatriate assets misappropriated by Gaddafi and his family. These efforts were generally unsuccessful, hampered as they were by Libya's political instability and the lack of a clear administrative structure to manage the asset recovery process. Disputes over which State organs should be involved in the recovery of different classes of assets also hobbled these nascent recovery efforts.

18. Libya's civil war ended in December 2015 with the establishment of a Government of National Accord and the support of the United Nations. In March of 2021, the Government of National Accord was reconstituted as a Government of National Unity, headed by a Presidential Council, whose Chairman acts as Head of State, and a Prime Minister.

19. Given the scale of the theft by Gaddafi and his family from the Libyan people, recovery of these stolen assets has been an essential, albeit constrained, priority for Libya. Indeed, a June 2021 report from the United Nations Interregional Crime and Justice Research Institute ("UNICRI") found that "in a scenario in which Libya were to prioritize the recovery of only 10% of the Assets lost through illicit financial flows, it would be possible to cover nearly 400% of the funding requirement of the United Nations Humanitarian Response Plan's Budgetary request for the Libyan Health Sector." *See* UNICRI, *Illicit Financial Flows and Asset Recovery* (June 2021), (http://www.unicri.it/sites/default/files/2021-05/Libya%20EN.pdf).

### LARMO Established to Recover Stolen State Assets
### With United Nations and European Union Support

20. Working with advisers from the European Union and the United Nations, Libya decided to establish a single agency that would operate in a transparent and accountable manner and be responsible for locating, recovering, and repatriating stolen as well as neglected or abandoned State assets for the Libyan people.

21. Accordingly, Resolution No. 1011/2017 of the Presidential Council of Libya's Government of National Accord established LARMO on October 24, 2017.

22. Resolution No. 1012/2017 of the Presidential Council of Libya's Government of National Accord dated October 24, 2017 appointed me as the head of LARMO.

23. The LARMO Statute was amended through Resolution No. 1496/2019. A true and correct copy of a translation of Resolution No. 1496/2019 is attached hereto as <u>Exhibit 13</u> (the "Statute").

24. Under Article 6 of the Statute, LARMO has the exclusive authority to trace, recover, and manage, stolen, neglected and abandoned assets of the Libyan State.

25. Article 7 of the Statute provides that LARMO shall undertake a search and investigation of "looted and smuggled Libyan Funds and Assets" and shall be responsible for collecting "all the related and evidencing documents."

26. Assets recovered by LARMO belong to the Libyan State. To ensure the transparent distribution of recovered assets, the Statute gives LARMO title to all stolen, neglected or abandoned State assets, recovered from abroad, until 30 days after their recovery. Thereafter, though LARMO does not own the assets, LARMO continues to administer those assets in a fund, until those assets are ultimately distributed to local and municipal governments that comply with transparency and anti-corruption provisions. *See* Statute Arts. 10, 11, 15, and 16.

27. Unfortunately, most of the records that would have detailed the theft of Libyan State funds by Gaddafi and his family have been destroyed or lost since the collapse of his regime. Despite the vast scale of the theft, LARMO has very few records indicating where Gaddafi, his family, and associates hid and continue to hide what they stole. Based on its

preliminary investigation, however, LARMO believes that Gaddafi and his family stashed hundreds of millions of dollars' worth of stolen Libyan State funds in numerous European, African, and other offshore jurisdictions.

28. LARMO retained two US-law firms, Baker & Hostetler LLP and Holland & Knight LLP to lead a global asset recovery effort. Both firms have duly registered with the Foreign Agents Registration Act ("FARA").

29. James Shaw, a Senior Legal Officer in the Asset Recovery unit of the United Nations Interregional Crime and Justice Research Institute ("UNICRI") provided a letter earlier this year, supporting LARMO's efforts. The letter concludes that "[t]he transparent but aggressive legal strategy proposed by LARMO's engaged professionals, Baker Hostetler and Holland & Knight, is considered by UNICRI as ideal in the recovery of Libyan assets for the benefit of the Libyan people." A true and accurate copy of Mr. Shaw's letter is attached hereto as Exhibit 14.

30. Through its counsel, LARMO has commenced its effort to identify, marshal, and recover misappropriated assets for the Libyan State. This Application comprises a key part of that effort. LARMO intends to use the information obtained pursuant to this Application to bring legal proceedings around the world to seize and recover assets consistent with its mandate and for the benefit of the Libyan people.

31. It is important to clarify that LARMO does not currently seek assets already held by other Libyan State entities. For example, the Central Bank of Libya ("CBL") and the Libya Investment Authority ("LIA") both have assets in foreign jurisdictions. Though many of these assets were frozen in response to the Gaddafi regime's crimes, those assets unambiguously belong to CBL and LIA as organs of the Libyan State.

32. Nonetheless, because LARMO is aware that Gaddafi and his family would at times use the LIA and CBL accounts for personal transactions, some of its requests may seek information regarding assets and transaction undertaken in the name of the CBL and the LIA but which actually stole money from these entities for the benefit of Gaddafi and his family.

### Scope of Proposed Discovery

33. LARMO understands that foreign banks typically use U.S.-based banks to clear dollar-denominated transactions using the Clearing House Interbank Payments System ("CHIPS"). The CHIPS system is used for virtually all dollar-denominated transactions and for transactions where the dollar is used as an intermediate currency to facilitate a currency exchange. U.S.-based correspondent banks that execute these clearing transactions keep detailed records showing the source and destination for all such transactions.

34. Correspondent banking records of relevant dollar-denominated transactions will allow LARMO to identify and trace assets to be recovered under its mandate as well as to identify the persons improperly holding such assets in various foreign jurisdictions in which LARMO's assets are believed to be located.

35. Based on its investigation to date, LARMO has reason to believe that assets misappropriated by Gaddafi, his family, and/or his agents, were transferred through the following New York-based correspondent banks:

   a) Bank of America N.A.

   b) Citigroup Inc.

   c) JP Morgan Chase Bank N.A.

   d) UBS Group A.G.

   e) HSBC Bank

      f) Credit Suisse Bank N.A.

      g) Bank of New York Mellon Corporation

      h) Deutsche Bank Trust Company Americas

36. As detailed in the subpoenas, attached to the Application as <u>Exhibits A-H</u>, LARMO seeks records from the above-listed banks relating to dollar-denominated transactions undertaken by or on behalf of Muammar Gaddafi.

37. Once the information sought in the subpoenas is obtained, LARMO will utilize that information and legal proceedings in the relevant jurisdictions will be commenced to freeze and recover the identified assets.

38. LARMO will act to the fullest extent of its statutory authority to pursue the recovery of assets looted by Gaddafi and his family and to restore this wealth to the Libyan people to whom it ultimately belongs.

Pursuant to 28 U.S.C. § 1746, I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: December 4, 2021

                                                     Anwar Arif